**Signed January 22, 2021.**



_____
**Ronald B. King
Chief United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HELAINE MICHELE MCKENDRICK, | § | CASE NO. 20-51568-RBK |
| | § | |
| DEBTOR | § | CHAPTER 13 |

### OPINION

REYN Holdings, LLC ("REYN") filed a proof of claim in this bankruptcy case for $48,110.74 that the debtor Helaine Michele McKendrick (the "Debtor") allegedly owes to REYN. The Debtor was the guarantor of a Lease Agreement (the "Lease") between REYN, as landlord, and Jon-Bi, LLC d/b/a Diamond Spa ("Diamond Spa"), a company owned by the Debtor, as tenant. The Debtor objected to REYN's proof of claim. The Debtor asserts that $48,110.74 for unpaid rent and other expenses incurred as a result of Diamond Spa's breach of the Lease is excessive because it doesn't account for rent received by REYN from subsequent tenants during Diamond Spa's Lease term. For the reasons set forth below, the Court agrees with the Debtor and sustains the Debtor's objection in part.

1

## I. JURISDICTION AND VENUE.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b)(2)(B), and 1334(b). As a proceeding to determine the allowance or disallowance of a claim against the estate, this matter is a core proceeding arising under title 11 referred to the Court by the Standing Order of Reference in the Western District of Texas. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## II. BACKGROUND.

In 2015, Westwood Venture Limited Partnership ("Westwood Venture") leased a commercial suite in Boerne, Texas (the "Leased Premises"), to Diamond Spa. In 2017, REYN purchased the Leased Premises from Westwood Venture and assumed the Lease as landlord.

The Lease term commenced on December 1, 2015, and was to end on December 31, 2020. The Lease provided for monthly rents of $1,400.00 from February 2016 through December 2017, $1,800.00 for each month in 2018, and $2,000.00 for each month in 2019 and 2020. The Lease also required Diamond Spa to pay, as additional rent, $300.00 per month for its estimated pro rata share of the property's real-estate taxes, common-area maintenance costs, management fees, and insurance costs (collectively, "Building Costs"). At the end of each year and at the end or termination of the Lease, these estimated Building Costs would be adjusted, or "trued up," to reflect the actual amount of such costs, with REYN being paid or Diamond Spa being refunded as necessary.

The Debtor also executed a Continuing Lease Guaranty (the "Guaranty") by which she unconditionally guaranteed the full and prompt payment of rent and all other sums required to be paid by Diamond Spa under the Lease. The Debtor also promised to pay all of the landlord's costs

2

and expenses (including reasonable attorneys' fees) incurred in collecting the guaranteed payments or enforcing the Guaranty as well as all damages suffered by the landlord in case of any default or breach under the Lease or the Guaranty.

Beginning November 1, 2017, Diamond Spa ceased paying rent on the Leased Premises, and Diamond Spa vacated the Leased Premises in December 2017.

In an event of default under the Lease, section 22 of the Lease provided REYN with the option to terminate the Lease or to terminate Diamond Spa's right to possession of the Leased Premises. In the event of such termination, the Lease still obligated Diamond Spa "to pay rent and all other amounts due or to become due as provided in this Lease for and during the entire unexpired portion then remaining of the Lease term" plus interest at a rate of 18% per annum. The Lease also provided REYN with two options in the event of termination. The first option allowed REYN to relet the Leased Premises, with Diamond Spa responsible to pay REYN all brokerage and/or legal fees incurred in connection with reletting the Leased Premises. In this scenario, the Lease provided that REYN "shall credit [Diamond Spa] only for such amounts as are actually received from such reletting during the then remaining Lease term." The second option allowed REYN to recover as damages from Diamond Spa the value of the remaining rent due under the Lease term reduced by the present rental value of the Leased Premises for the remainder of the Lease term.

REYN chose the first option. REYN leased the Leased Premises to GMCCJP LLC d/b/a Twisted Oak Hunting and Outfitter Supply ("Twisted Oak"), with payment of rent to begin July 16, 2018, through August 31, 2019. Twisted Oak's lease provided for rents of $875.00 from July 16, 2018, to July 31, 2018, $1,750.00 for August 2018, and $2,250.00 per month from September

3

2018 through August 2019. Twisted Oak's lease also provided for CAM fees of $460.00 per month.

REYN subsequently leased the Leased Premises to Premium Pharma, LLC ("Premium Pharma") beginning September 1, 2019, with the lease term running beyond December 31, 2020, the end of Diamond Spa's Lease term. Premium Pharma's lease provided for rents of $2,700.00 per month from September 2019 through August 2020 and $2,775.00 per month from September 2020 through December 2020, when Diamond Spa's Lease term ended.

The Debtor filed for chapter 13 bankruptcy on September 2, 2020 (the "Petition Date"). Shortly thereafter, REYN filed a proof of claim in the amount of $48,110.74 seeking unpaid rents and other fees and expenses allegedly owed by Diamond Spa, and for which the Debtor would be liable under the Guaranty. The amount of the claim included: (i) $19,852.61 in unpaid rents from November 1, 2017, through July 16, 2018,[1] as well as Building Costs and true-up amounts; (ii) $1,201.25 in late fees; (iii) $541.25 in electrician fees for replacement of light fixtures removed by Diamond Spa; (iv) $146.68 in locksmith fees for replacing locks on the Leased Premises; (v) $2,280.00 for a brokerage commission incurred in reletting the Leased Premises; (vi) $12,507.39 in legal fees; (vii) $13,081.56 in interest; and (viii) a credit for a $1,500.00 deposit paid by Diamond Spa.

The Debtor objected to REYN's proof of claim and argued that, pursuant to the Lease, Diamond Spa should have been credited for rent payments from REYN's subsequent tenants, which payments were frequently in excess of the rent Diamond Spa owed. The Debtor argued that, because a guarantor's liability cannot exceed that of the principal obligor, this credit should

---

[1] This is the period in which the Leased Premises were vacant and for which REYN received no rent payments.

be applied to reduce the amount of REYN's proof of claim. The Debtor also argued that the amounts REYN claimed for electrician and locksmith fees, the brokerage commission, and interest thereon lacked a proper predicate and should be disallowed.

In response, REYN argued that defenses of offset and failure to mitigate are exclusive to the principal obligor and are unavailable to guarantors. Thus, according to REYN, the Debtor is unable to raise these defenses and is liable for the full amount owed under the Lease and the Guaranty.

A hearing was held and argument was heard on the Debtor's objection to REYN's proof of claim on December 3, 2020. At the hearing, REYN submitted into evidence invoices related to the electrician and locksmith fees as well as the brokerage commission. John Nichols, a Manager with REYN, testified as to the authenticity of these invoices. Mr. Nichols also testified as to the accuracy of the late fees and the true-up amounts for the Building Costs. Cassidy Daniels, counsel to REYN, testified as to the amount, reasonableness, and necessity of her legal fees.

### III. DISCUSSION.

The briefing and arguments of the parties raise three issues for the Court to resolve: (i) whether the Debtor, as a guarantor of Diamond Spa's Lease with REYN, may raise the defenses of offset and failure to mitigate; (ii) whether REYN must credit Diamond Spa, and by extension the Debtor, for rents collected from Twisted Oak and Premium Pharma in excess of the rent owed by Diamond Spa; and (iii) whether the proof of claim properly included amounts for late fees, true-up amounts, electrician and locksmith fees, the brokerage commission, legal fees, and interest thereon.

### A. *Defenses of Offset and Failure to Mitigate*

The Debtor's executed Guaranty "unconditionally guarantee[d] the full and prompt payment of Rent (as defined in the Lease) and all other sums required to be paid by [Diamond Spa] under the Lease." REYN argues that the Debtor's status as a guarantor precludes her from receiving a credit for the rent received by REYN from subsequent tenants, as the defenses of offset and failure to mitigate are personal to the principal obligor and unavailable to an unconditional guarantor. *See **Raj v. Four Star Bus., Inc.***, No. 01-19-00284-CV, 2020 WL 2026585, at *3 (Tex. App.—Houston [1st Dist.] Apr. 28, 2020, no pet.) ("Texas courts have held that a guarantor may not assert defenses personal to the principal obligor, such as usury and offset."). As pointed out by the Debtor, however, "[a] guarantor's liability on a debt is measured by the principal's liability unless a more extensive or more limited liability is expressly set forth in the guaranty agreement." ***Hous. Furniture Distribs., Inc. v. Bank of Woodlake, N.A.***, 562 S.W.2d 880, 884 (Tex. App.—Houston [1st Dist.] 1978, no writ). Through the Guaranty, the Debtor guaranteed to pay "Rent (as defined in the Lease) and all other sums required to be paid by Tenant under the Lease." There is nothing in this provision that expressly sets forth more extensive liability than that of Diamond Spa under the Lease. In fact, the Guaranty seems to contemplate that the Debtor's liability would match that of Diamond Spa.

Furthermore, the Court is of the opinion that this dispute is improperly framed as one involving offset or failure to mitigate. It is undisputed that REYN mitigated its damages by seeking and obtaining subsequent tenants for the Leased Premises vacated by Diamond Spa. Because the Court agrees with the Debtor that the Debtor's liability as guarantor is limited to the liability of Diamond Spa as principal obligor, the Court believes the issue is simply one of

measurement of damages for breach of contract, to which the Court will turn now.

### B. *Credit for Subsequent Rents Received*

When Diamond Spa ceased paying rent to REYN and vacated the Leased Premises, it breached the Lease with REYN. Under Texas law, and as provided by the Lease itself, Diamond Spa's breach allowed REYN to take possession of the property and sue for damages. *See **DDR DB Stone Oak, LP v. Rector Party Co.***, No. 04–17–00018–CV, 2017 WL 6032541, at *3 (Tex. App.—San Antonio Dec. 6, 2017, no pet.) ("When a tenant breaches a lease and abandons the property, a landlord may retake possession of the property and sue for damages." (citing ***White v. Watkins***, 385 S.W.2d 267, 270 (Tex. App.—Waco 1964, no writ))).

In Texas, "[t]he universal rule in measuring damages for a breach of contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach." *Id.* at *4 (citing ***Phillips v. Phillips***, 820 S.W.2d 785, 788 (Tex. 1991); ***Sharifi v. Steen Auto., LLC***, 370 S.W.3d 126, 148 (Tex. App.—Dallas 2012, no pet.)). This rule mandates that "a party should be awarded neither less nor more than its actual damages." *Id.* (citing *Phillips*, 820 S.W.2d at 788; *Sharifi*, 370 S.W.3d at 148).

Where, as here, a tenant breaches a lease and abandons the premises, and the landlord elects to retake possession of the property and relet the premises, the proper measure of damages under Texas law is the difference between the amount of rent originally contracted for and that realized from reletting. *See id.* at *3; ***Crabtree v. Southmark Commercial Mgmt.***, 704 S.W.2d 478, 480 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (holding that, when a tenant breaches a lease by abandoning the property and terminating rental payments and the landlord relets the property to another tenant, the landlord "can recover the contractual rent reduced by the amount

7

to be received from the new tenant" (citing *Maida v. Main Building of Hous.*, 473 S.W.2d 648, 651 (Tex. App.—Houston [1st Dist.] 1971, no writ); *Speedee Mart Inc. v. Stovall*, 664 S.W.2d 174 (Tex. App.—Amarillo 1983, no writ))); *White*, 385 S.W.2d at 270 (holding that where a landlord relets the premises, "the measure of lessor's damage is generally the difference between the rental originally contracted for and that realized from the reletting" (citing *Early v. Isaacson*, 31 S.W.2d 515, 517 (Tex. App.—Amarillo 1930, writ ref.))).

The appropriate measure of damages in this case is the amount that Diamond Spa would have owed REYN under the Lease for the remainder of the Lease term after Diamond Spa breached the Lease reduced by the amount REYN received from its subsequent tenants.[2] In fact, the parties specifically contracted for this measure of damages, as the Lease provides that "Landlord shall credit Tenant only for such amounts as are actually received from such reletting during the then remaining Lease term."

Diamond Spa breached the Lease on November 1 when it ceased paying rent. Under the Lease, Diamond Spa would have owed a base rent of $1,400.00 per month for November and December 2017, $1,800.00 per month from January 2018 through December 2018, and $2,000.00 per month from January 2019 through the end of the Lease in December 2020. Diamond Spa would have owed estimated Building Costs of $300.00 per month from November 2017 through July 2018, $460.00 per month from August 2018 through December 2019, and $490.00 per month from January 2020 through December 2020. Thus, from November 2017 through December 2020, Diamond Spa would have owed base rent of $72,400.00 and estimated Building Costs of $16,400.00, for a total amount owed of $88,800.00. After a credit of $1,500.00 for a deposit paid

---

[2] Because the Lease considered the estimated Building Costs as additional rent, the amount owed by Diamond Spa and the amount received from the subsequent tenants includes these estimated Building Costs.

by Diamond Spa, the total amount Diamond Spa would have owed for the remainder of its Lease term is $87,300.00.

Evidence submitted demonstrates that Twisted Oak paid base rent of $875.00 in July 2018, $1,750.00 in August 2018, and $2,250.00 per month from September 2018 through August 2019. Twisted Oak also paid estimated Building Costs of $230.00 in July 2018 and $460.00 per month from August 2018 through August 2019. Twisted Oak thus paid $29,625.00 in rent and $6,120.00 in estimated Building Costs, or a total of $35,835.00, throughout its lease term. Premium Pharma's lease provided for base rents of $2,700.00 per month for the first twelve months of the lease, which began on September 1, 2019, and $2,775.00 per month for the second twelve months. Thus, it appears to the Court that Premium Pharma paid $2,700.00 per month from September 2019 through August 2020 and $2,775 per month from September 2020 through December 2020, the end of Diamond Spa's Lease term. The evidence also demonstrates that Premium Pharma paid estimated building costs of $460.00 per month from September 2019 through December 2019 and $490.00 per month from January 2020 through December 2020. Premium Pharma thus paid $43,500.00 in rent and $7,720.00 in estimated Building Costs, a total of $51,220.00, throughout its lease.

The combined amount REYN received from Twisted Oak and Premium Pharma for rent and estimated Building Costs was thus $87,055.00. Subtracting this amount from the amount owed by Diamond Spa, $87,300.00, leaves a balance due of $245.00. Thus, the total amount of damages sustained by REYN in terms of lost rent and Building Costs as a result of Diamond Spa's breach is $245.00.

### C. *Other Fees and Interest*

In addition to the unpaid rent discussed above, REYN's proof of claim also sought: (i) $9,733.04 in accrued interest on the unpaid rent; (ii) $1,201.25 in late fees for rent payments and $529.23 in interest thereon; (iii) $2,627.61 in Building Cost true-up amounts and $1,416.32 in interest thereon; (iv) $541.25 in electrician fees and $255.85 in interest thereon; (v) $146.68 in locksmith fees and $69.34 in interest thereon; (vi) a $2,280.00 brokerage commission incurred in reletting the Leased Premises and $1,077.78 in interest thereon; and (vii) $12,507.39 in legal fees incurred in collecting damages for the breach. The Court will address each of these items in turn.

#### i. *Interest on Unpaid Rent*

REYN claims $9,733.04 in interest on unpaid rent. Section 22 of the Lease provides that "[a]ll sums due and owing by Tenant to Landlord under this Lease shall bear interest from the date due until paid" of 18% per annum. The Debtor does not dispute the amount of interest owed on unpaid rent. Thus, the full amount of $9,733.04 in interest on unpaid rent will be allowed.

#### ii. *Late Fees on Unpaid Rent*

REYN claims $1,201.25 in late fees for rent payments and $529.23 in interest thereon, a total of $1,730.48. Section 22 of the Lease also allows REYN to collect late fees of 5% on any unpaid rent installment. REYN claims late fees of $510.00 plus $187.20 in interest for unpaid rent in 2017 and $691.25 plus $342.03 in interest for unpaid rent in the first six and a half months of 2018, before REYN relet the Leased Premises to Twisted Oak. The Court agrees that REYN is entitled to these late fees and interest; however, it appears REYN miscalculated the amount of late fees and interest due for unpaid rent in 2017. Diamond Spa failed to pay rent or estimated Building Costs in November and December 2017 and thus owed REYN $3,400.00 for this period. Five

10

percent of this amount is $170.00. Interest at 18% per annum compounded monthly[3] over the 34 intervening months before the Petition Date would be $112.03. The amounts for the 2018 late fees and interest appear correct. Thus, the total amount of REYN's claim for late fees and interest thereon is $1,315.31.

### iii. Building Cost True-Up Amounts

REYN claims $2,627.61 in Building Cost true-up amounts and $1,416.32 in interest thereon, a total of $4,043.93. Section 5 of the Lease provides that the Building Costs "shall be adjusted between Landlord and Tenant annually and at the expiration or earlier termination of this Lease, and payment shall be made to, or refund made by, Landlord, as the case may be, and the Landlord shall receive the precise amount due as Tenant's Pro Rata Share of the actual cost of said [Building Costs]." The Court finds that Mr. Nichols's testimony as to the Building Cost true-up amounts was credible, and thus REYN is entitled to the full amount of $4,043.93 under the Lease.

### iv. Electrician and Locksmith Fees

REYN claims $541.25 in electrician fees for replacing light fixtures and $255.85 in interest thereon. REYN also claims $146.68 in locksmith fees and $69.34 in interest thereon The Court finds Mr. Nichols' testimony and the evidence submitted by REYN to be credible as to the amount and necessity of these fees. REYN is entitled to the full amounts of these fees plus interest, a total of $883.12.

### v. Brokerage Commission

REYN claims a $2,280.00 brokerage commission incurred in reletting the Leased Premises and $1,077.78 in interest thereon. Section 22 of the Lease provides that "Tenant shall pay to

---

[3] Mr. Nichols testified that he calculated interest amounts by compounding monthly. The Court has used this method for consistency.

11

Landlord all brokerage and/or legal fees incurred in connection [with reletting the Leased Premises]." The Court finds Mr. Nichols's testimony and the evidence submitted by REYN to be credible as to the amount and necessity of the brokerage commission. REYN is entitled to the full amount of the commission plus interest, a total of $3,357.78.

      *vi.*     *Legal Fees*

REYN claims $12,507.39 in legal fees incurred in collecting damages for the breach. As stated above, section 22 of the Lease provides that "Tenant shall pay to Landlord all brokerage and/or legal fees incurred in connection [with reletting the Leased Premises]." The Court finds Ms. Daniels's testimony and the evidence submitted by REYN to be credible as to the amount, reasonableness, and necessity of these legal fees. REYN is entitled to the full amount of the legal fees, $12,507.39.

      *vii.*    *The Debtor's Liability*

Pursuant to the Guaranty, the Debtor promised to pay rent and "all other sums required to be paid by Tenant under the Lease" as well as "all of Landlord's costs and expenses (including reasonable attorneys' fees) incurred in endeavoring to collect" those payments. Thus, REYN is entitled to a claim for all of the amounts discussed above, a total of $31,840.57, against the Debtor as guarantor. This amount combined with the $245.00 owed by Diamond Spa and the Debtor for unpaid rent brings the total amount of REYN's claim to $32,085.57.

**IV.**   **CONCLUSION**

Under the Lease between the parties and under Texas law, Diamond Spa was entitled to a credit for the amount of rent paid by subsequent tenants in excess of the amount that would have been due from Diamond Spa for the remainder of Diamond Spa's Lease term in absence of a

breach.  Because the Debtor, as guarantor, can only be liable to the same extent as Diamond Spa, the principal obligor, REYN's claim must be reduced by the amount of this credit.  REYN is entitled, however, to a claim for late fees on rent, Building Cost true-up amounts, electrician and locksmith fees, the amount of a brokerage commission, legal fees, and interest, as discussed above.  The total amount of REYN's claim, including these amounts and after applying the credit for rent paid by subsequent tenants, should be $32,085.57.

This Opinion shall constitute the Findings of Fact and Conclusions of Law of the Court pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.  A separate order will be entered.

# # #